Price, J.
When the plaintiff below rested her case, the court sustained a motion to direct a verdict for the defendant, solely on the ground that the testimony introduced to support the plaintiff’s case, showed that her cause of action was barred by the one year statute of limitations. The circuit court reversed the judgment rendered on the verdict so directed, and it becomes necessary that we first consider the material facts which the plaintiff’s evidence tends to establish, and we find that on or about November 1, 1897, the plaintiff in error was engaged, as he had been for several years prior to that date, in the practice of medicine and surgery, and that he held himself out as competent to practice in surgery and medicine. At that time the plaintiff below was suffering severe pain in her right side, and accompanied by her husband, called at the office of Dr. Gillette, plaintiff in error, to consult with him as to the cause of the pain and its treatment. After some inquiries and external examination, the doctor pronounced her ailment appendicitis, and that an operation would be necessary to relieve her suffering and its canse. For this purpose she would have to go to a hospital. The cost of the operation and treatment was then discussed, and the ability of the husband to pay was inquired into, and he being a teamster and not earning large wages, it was agreed that the charges for the operation and subsequent necessary treatment would be $25.00, which might be paid as he was able, or as the husband claims, soon as his wife was cured; and *118 as the wife states it: “I will take your case and attend to your wife for $25.00.” The hospital charges were not included in this price.
An understanding as to compensation having been reached, it was arranged that the woman should go to the hospital, which she did on November 2, 1897, and on the next day, the plaintiff in error performed an operation for appendicitis, after and while the patient was under the influence of an anaesthetic.
After the abdomen had been opened in the region of the appendix, for the purpose of absorbing liberated blood, plaintiff in error placed in the cavity a cheesecloth sponge, which consisted of seven or eight layers of cheese-cloth, each two by four inches. After an examination of the appendix it was found in a healthy condition, but there were indications that required an examination of the pelvic region. The incision made to reach the appendix was then closed, leaving the cheese-cloth sponge in the cavity. In closing the incision the peritoneum was stitched with kangaroo tendons, and the muscles and skin with silkworm gut. There was no drainage made for the wound. Next, an incision was made in the median line between the umbilicus and pubes, in the abdominal cavity. This was two and a half to three inches from the place of the first incision, and there was found a tumor, or -more accurately speaking, a hematoma, resulting from an extra uterine pregnancy. This was removed and cavity cleansed and closed, and the patient put to bed in the hospital where she remained about five weeks. She was not conscious during either operation, and did not know of the second, until several 'days thereafter.
About the tenth day she felt a -severe pain in Eer side, and a sensation like the bursting pf the closed *119 incision. The plaintiff in error was called and informed of what had occurred. The wound was discharging pus so as to saturate layers of cotton; he said he had been looking for that, and that it came from the tendon used to sew up the wound; that the tendons would soon run out and then the incision would heal. She was visited at the hospital daily, perhaps, while there, and on December 5, 1897, she was removed from the hospital to her home. The pus continued to run from the first incision, and in about two weeks the doctor was called to the residence of plaintiff, because of her suffering, and looked at the side and saw its condition, and stated to her, “that it (the wound) was coming along all right; just as soon as that tendon is absorbed it will heal up — that is what is doing it.”
This conversation occurred about December 20, 1897. The'doctor did not call again until the following March, 1898. During this interval, the discharge of pus continued, and increased so that it would saturate several thick cloths each day. On the visit in March, 1898, the following conversation is said to have occurred, when he asked the patient as to her condition: “Well, doctor, I don’t seem to get any better; .it runs just the same as it did. How soon will it run out?” to which he replied: “That I can’t .tell. Sometimes it takes longer than others, sometimes that tendon is absorbed in three months, and sometimes it takes longer. If you will just have patience it will run out, and it will heal up, and you will be all right.”
In April following, the woman, with her husband, called at the office of the doctor, where she informed him that her side was no better — was still discharging; at which he expressed some surprise, but advised patience again, and said that the tendon would *120 run out. He then said to the husband that he ought to pay him some money for his services, and the husband replied, that he would get his money when the wife got well. The doctor proposed that he would take the tendon out, and the wound would then heal, and to this end they were requested to meet him at the Hospital the next day which they did. He advised them he could probe for the tendons without the use of anaesthetics and that she need not remain at the hospital. An attempt was made to remove the tendon by probing but without success, and he then assured them that it would run out if left alone, and that it was not necessary to open the old incision; and assured them again, that if they would but have patience the tendon would run out. This was near April 15, 1898. The evidence tends to show that the patient relied upon these assurances and went home, and the discharge continued unabated during the summer, with increasing suffering. The wound was dressed twice a day, the thick, greenish discharge, saturating the cloths applied to it.
In the early part of November, 1898, the plaintiff, in company with a neighbor lady, went to the office of plaintiff in error. He inquired as to how she was getting along,, to which she replied: “Well, doctor, I am not getting along very well.” He said: “Is not that healed up yet?” I said: “No, sir, it is not.” He remarked: “You take a chair and I will be at leisure in a minute.” After that he called Mrs. Tucker into his private office and said: “Isn’t there any change in that?” She answered that it was about the same, when he rejoined: “It is funny that it don’t get better.” At this point Mrs. Tucker said to him, that if he had done his work right, she would have been well. This remark angered him and he *121 said: “Well, if that is the way you feel about it, Mrs. Tucker, you can get right out of my office; I wouldn’t do any more for you if I could.” He ordered both Mrs. Tucker and her companion from his office, and they left under a threat that an officer would be called to eject them.
The language of the foregoing interview clearly shows, that up to that time the doctor recognized Mrs. Tucker as his patient and entitled to his treatment and advice.
The discharge of purulent pus increased and the condition grew worse. In January, 1899, Mrs. Tucker called another physician. After some treatment without apparent benefit, the second physician decided that some foreign substance had been left in the*cavity at the-first operation, and on April 12,1899, he operated by opening up the old incision and there found the cheese-cloth sponge, which plaintiff in error had left within when he closed it.
This demonstrated that the kangaroo tendon had not been the source of the trouble, as the doctor had assured them. We therefore find from the facts stated and kindred facts found in the record, that the relation of physician and surgeon existed between these parties from November 2, 1897, until he dismissed her from his office early in November, 1898. The patient during all that time sustained towards the surgeon a relation of peculiar trust and confidence, and when appealed to for relief and encouragement, he assured her and assuaged her doubts by saying, that only patience was needed to bring an entire recovery from the effects, not of appendicitis, but from the results of the incision vainly made for its treatment. There was an agreed consideration for not only the operation itself, but for *122 such treatment, skill and care as might be necessary thereafter, and the engagement was such that the law implies a promise on the part of the surgeon, the plaintiff in error, that for the operation and subsequent necessary treatment, he would use due care and diligence to the end that a recovery might be had. This obligation arose in the contract of employment, and as a matter of law, and the obligation existed as long as the relation of patient and physician and surgeon continued. In the engagement of the plaintiff in error, as a surgeon, he assumed to exercise the ordinary care and skill of his profession, in the light of the modern advancement and learning on the subject, and became liable for the injuries resulting from his failure to do so. See Geiselman v. Scott, 25 Ohio St., 86. And the rule is stated in Craig v. Chambers, 17 Ohio St., 254, in the following form: “The implied liability of a surgeon, retained to treat a case professionally, extends no further, in the absence of a special agreement, than that he will indemnify his patient against any injurious consequences resulting from his want of the proper degree of skill, care or diligence in the execution of his employment . * * .”
No promise to effect a cure is implied, but due diligence, care and ordinary skill are implied undertakings. See Grindle v. Rush, 7 Ohio (part 2), 123-5. Moreover, we hold the proposition to be sound, that this degree of skill and care is to be exercised, not only in performing the operation, but also in the subsequent necessary treatment following such operation, unless the terms of employment otherwise limit the service, or the surgeon give the patient notice, that he will not or cannot afford the subsequent treatment. *123 We tliink this proposition needs no argument for its support.
However, we find a pointed authority in the case of Williams v. Gilman, 71 Me., 21. While that case involved the conduct or misconduct of e. veterinary surgeon, we have no doubt its doctrine may be applied to the conduct of surgeons practicing their profession upon a human being. The syllabus of that case is: “In an action to recover damages caused by the alleged negligence and unskillfulness of a veterinary surgeon in gelding a colt: Held, that instructions to the jury, that it was the duty of the defendant to give the colt such continued further attention, after the operation, as the necessity of theicase required, in the absence of special agreement, or reasonable notice to the contrary, were correct, though the declaration only alleged want of care and skill with reference to the operation itself.”
In the opinion found on pages 22 and 23, the court say: “It is true, the declaration only alleges a want of care and skill on the part of the defendant with reference to the operation itself; but an allegation of negligence in this respect, would be sustained by proof that the defendant failed to use such appliances, or prescribe such treatment as to one who exercised reasonable skill and care in his calling were obviously necessary to preserve the colt from injury resulting from the operation. Without some order from the plaintiff to the contrary, or some notice from the defendant, or agreement of parties, limiting the defendant’s liability and specifying to what extent his services were to be required and rendered, it was a part of the duty of such a practitioner, incident to the performance of the operation itself, to direct what should be done to prevent injurious results that might *124 naturally follow, and to give his personal attention to such matters, so far as they fell within the ordinary scope of a veterinary surgeon’s calling. Proof that he failed in these respects would sustain the allegation that he was guilty of negligence in his conduct with reference to the operation which he had been employed to perform.”
In an earlier case, Ballou v. Prescott, 64 Me., 305, we find another decision on the physician’s duty to a patient. The syllabus says: “Though the language used and the effect of it, are questions of fact for the jury, in controversies relating to a contract by parol, yet it is also true that in many cases, the law will infer a definite, though perhaps implied contract from certain admitted facts. At least it will infer certain elements as belonging to particular contracts, or impose specific duties in connection with, and growing out of special undertakings, although these are entered into by parol. Especially is this true of contracts growing out of an employment quasi public in nature, like that of a professional man. Thus, the care and skill which a professional man guarantees to his employer, are elements of the contract into which he enters by accepting a professional engagement, So, continued attention to the undertakings, so long as attention is required, in the absence of any stipulation to the contrary, is equally an inference of the law, * * * and he is bound to use ordinary care and skill, not only in his attendance, but in determining when it may be safely and properly discontinued.”
This, we believe, is a sound and salutary rule to govern the relation existing between the patient and the surgeon, who practices his profession and undertakes the serious operation described in this record. If such care is due to a dumb animal, it is surely due *125 to a human being. There was no limitation in the services proffered and engaged, and no notice of an intended limitation given the patient, and indeed, none is claimed in this case, until the surrender of the case at the surgeon’s office in November, 1898.
The action of Mrs. Tucker, which is now before us, was commenced in the lower court on June 27,1899— not eight months from the day on which plaintiff in •error severed his connection with the case.
In view of these facts, and the nature of the engagement and duties of plaintiff in error, when did the statute of limitations begin to run against the cause of action of Mrs. Tucker? From the day when the incision was closed leaving the cheese-cloth sponge within the cavity? Or, from the day when the relation of' patient and surgeon ceased, the sponge still being in the cavity? If from the date of closing the wound, which was November 3, 1897, the trial court was right in telling the jury the plaintiff’s right of action was barred, when her suit was commenced. If from the date when the surgeon dissolved his connection with the case, her suit was in ample time.
The statute applied by the trial court is section 4983, Revised Statutes, which is: “Within one year: An action for libel, slander, assault, battery, malicious prosecution, false imprisonment or malpractice.” This section is to be read with section 4979, which is: “Civil actions other than for the recovery of real property, can only be brought within the following periods, after the cause of the action accrues.”
So, the other form of the inquiry is, when did the cause of action of Mrs. Tucker accrue? The plaintiff in error contends it accrued, if at all, on November 3, 1897, and so the court instructed the jury.
If the foregoing views which we have expressed, as *126 to the nature of the surgeon’s engagement and obligation are sound, it would seem that the court was wrong in its application of the above statute to the facts of the case. We do not agree with counsel for defendant in error that the case made in the petition was an action on the contract, and therefore governed by the six-year limitation. Rather, it was an action to recover for breach of contract, for negligence in performance of the contract, or a breach of the terms of the contract which the law implies. It is contended, for plaintiff in error, that the action sounds in tort and not on contract, and that the surgeon being charged with a tort or wrong, the cause of action accrued when the tort or wrongful act was committed.
We believe that the situation is covered by Addison on Torts, 13, Avhere it is said: “A tort may be dependent upon, or independent of contract. If a contract imposes a legal duty upon a person, the neglect of that duty is a tort founded on contract; so that an action ex contractu for the breach of contract, or, an action ex delicto for the breach of duty may be brought at the option of the plaintiff.” See Staley v. Jameson, 46 Ind., 159.
Therefore, if we call malpractice a tort in this case, it is a tort growing out of a breach of contract which the law implies from the surgeon’s employment and undertaking to perform the operation. We have seen that it was a continuous obligation and recognized by the law, and it was alive and binding so long as the relation of physician and patient subsisted. If so, it was the ever present duty of the surgeon to remove the sponge from the body of the patient. It was a constant and daily obligation to use ordinary skill and care, and if by omission or negligence he had left a foreign substance within the walls of the inch *127 sion at the operation, it behooved him to afford timely relief. Neglect of this duty imposed by a continuous, obligation was a continuous and daily breach of the same, and as the facts show, caused continuous, increasing, daily and uninterrupted injury.
Should she have brought her action immediately following the sewing up the walls enclosing the sponge? If she had done so, there were as yet, no injurious consequences, and but nominal, if any damages, could have been recovered. The injury consisted not so much in leaving the sponge within the cavity, as negligently, continuing it there, or, allowing it to remain there from day to day for about a year and until he dismissed her from his attentions. The grievance of the plaintiff was not alone confined to the negligence in the operation, but also in the painful consequences which followed, and which, as. he repeatedly assured her, would soon disappear, if she Avould but patiently wait.
In what we have said and now say, it is Avholly immaterial whether the patient knew of the true source of her trouble or not. We do not, in any degree, place our conclusions on the fact that for more than a year the plaintiff was in ignorance, as to the sponge remaining in the wound. On the contrary, we are dealing with her rights under the contract, for the breach of which she has sued, and the cause of action did not so much accrue of the date of the negligent operation, as on account of the continuous breach of duty which inflicted the injurious consequences. In other words, that the statute will run from the date of the injuries,, rather than from the date of an event which resulted in the injuries.
*128 At this point we again refer to the case of Craig v. Chambers, 17 Ohio St., 254. In' that case, Chambers and his wife Jane, brought suit against Craig, a surgeon, for negligently and unskillfully setting the dislocated shoulder of the wife and for negligent treatment of the injury.
The plaintiff in that case excepted to the court charging the jury “that the plaintiff would not be entitled to a verdict, unless the evidence satisfied the jury that some portion of the injury of which plaintiff complains, was the result of some want of proper skill, diligence or attention of the defendant; or that the plaintiff was in some way damaged by such negligence.”
Speaking of this and other instructions, White, J., on page 260, says: “Her action is founded on the breach by the defendant, of the duty which he owed her, or of the contract to be implied between them arising from the employment. But the implied liability on the part of a professional man, in our opinion, goes no further than that he will indemnify his employer against any injurious consequences resulting from his want of proper skill, care or diligence in the execution of his employment. Therefore, where there is no injury, there is no breach; and the evidence must warrant the jury in inferring injury before they can find a breach. And this conclusion we believe* to be supported by the authorities.”
On page 261, of the same opinion, it is said of the charge concerning plaintiff’s injuries: “But in view of one part of the argument of the counsel of the defendant in error, it is proper to say, that we suppose that any want of the proper degree of skill or care which diminishes the chances of the patient’s recovery, prolongs his illness, increases his suffering, or, *129 in short, makes his condition worse than it would have, been, if due skill and care had been used, would in a legal sense, constitute injury.”
See also Bank v. Waterman, 26 Conn., 324, where it is held that “when an injury however slight, is complete as a legal injury at the time of the act, the period of limitation at once commences, but when the act is not legally injurious until certain consequences occur, the period takes date from the consequential injury.” See Shear. & Redf. on Neg., section 613.
If the doctrine is sound, and we think it is, the mere closing of the incision in question over the sponge was not the plaintiff’s cause of action, if no injurious consequences followed. But if evil consequences followed, and plaintiff was injured, her cause of action accrues when her injuries occurred; and if these injuries blended and extended during the entire period the surgeon was in charge of the case, her right of action became complete when the surgeon gave up the case without performing his duty.
Indeed, it would be inconsistent to say, that the plaintiff might sue for her injuries while the surgeon was still in charge of the case and advising and-assuring her that proper patience<would-witness a complete recovery. It would be trifling with the law and the courts to exact compliance with such a rule^ in order to have a standing in court for the vindication of her rights. It would impose-upon her an improper burden to hold, that in order to prevent The statute from running-against her right of action, she must sue while she-was following the advice of the surgeon and upon which she all the time relied.
We are cited to certain cases and textbooks by plaintiff in error, which are supposed to be in conflict with these views. Among these cases are Kerns v. *130 Schoonmaker, 4 Ohio, 331; Fee’s Admr. v. Fee, 10 Ohio, 470; Williams v. Pomeroy Coal Co., 37 Ohio St., 583. But we think an examination and comparison-of those cases, with facts and principles involved in the case at bar, will readily show that they are not opposed to our position here. Kerns v. Schoonmaker is a case where an action was brought to recover damages against the defendant for negligence and omission of duty as a justice of the peace. The negligence-alleged in the declaration was, that on April 25,. 1825, Stewart confessed a judgment in favor of Kerns before the justice. On April 28th, Stewart offered one Elliot, as bail for stay of execution, who was accepted as such by the justice; but the entry on the docket was so carelessly and informally made that Elliot was not legally bound thereby. The judgment debtor died insolvent before the supposed stay of execution expired, and when Elliot was prosecuted on the-stay bond, the court held it invalid and he was discharged. In the suit against the justice the amount of the judgment, interest, costs and expenses were demanded. The justice plead' not guilty and the one year bar of the statute of limitations. As to when • the statute began to run, the court say on page 333: “It is unnecessary to determine the precise moment when the statute did attach, for we entertain the opinion that no later period can be selected than the institution of the suit-against Elliot. Admitting that the plaintiff might reasonably expect Elliot to fulfill his supposed recognizance and pay the debt,.yet when he evinced his intention not to be bound, the plaintiff’s remedy against the justice was complete. * *
It is seen from this case, that the statute in bar did not necessarily commence with the negligent act of the justice in making entry of the stay bond, but that *131 it might be counted as commencing with the resistance of Elliot tvhen sued on the invalid bond.
In Fee’s Admr. v. Fee, supra, it Avas decided that “a fraudulent concealment by which the plaintiff has been delayed will not enlarge the time for bringing an action under the statute of limitations.”
As before stated, ignorance or concealment of the source of the injury of Mrs. Tucker is not the ground of our opinion, and hence Fee v. Fee is of no weight here. The same observation may be made as to part of the decision in Williams v. Pomeroy Coal Co. That Avas an action for trespass committed by defendant in making an excavation on land under lease, which he Avrongfully extended under the land or lot adjoining, and the salient facts decisive of that case are stated by White, J., on page 589 as follows: “The defendant in the present case had no estate or interest in lot 1222, further than the right to mine the coal therefrom. This he accomplished in 1862, and surrendered the premises. He had no authority from the owner of the fee, nor from Horton, his immediate lessor, to mine over into lot 1223; and at the time of the flowage of water from the abandoned mine into the mine of the plaintiff, he had for more than five years ceased to have any interest in lot 1222, or any right of entry thereon.” Then the court proceeds to say the action of trespass could not be maintained, because the plaintiff at the date of the commission of the trespass Avas not the owner of the land upon Avhich it was committed, and had he been such owner, the action would have been barred. But in previous language of the opinion the learned judge draws a distinction between a single trespass and the continuing of something wrongful upon the premises of the plaintiff; and the authorities which he cites more *132 properly reinforce our position than the contention of plaintiff in error.
Counsel for plaintiff in error cite also from text writers, among others, Wood on Limitations, section 177, to the effect “that in cases of tort, the statute usually commences to run from the date of the'tort, and not from the occurrence of actual damage.” This as to a single tort or wrong. But it is well to note tHat in section 178, the same author has more to say and it is this: “A breach of public duty may not inflict any direct immediate wrong on an individual; but neither his right to a remedy nor his liability to be precluded by time from its prosecution, will commence till he has suffered some actual inconvenience. But it is otherwise where there is a private relation between the parties where the wrongdoing of one at once creates a right of action in the other, and it may be stated as an invariable rule that when the injury, however slight, is complete at the time of the act, the statutory period then commences; but when the act is not legally injurious until certain consequences occur, the time commences to run from the consequential damage, whether the party injured is ignorant of the circumstances from which the injury results or not.” To sustain and illustrate this proposition the .author cites important cases.
A careful perusal of Buswell on Limitations and Angelí on same subject, also cited, will find the same distinction made. In most, if not all of the authorities cited and relied on to support views adverse to ours, the tort or wrongful act was complete as a single transaction.
This Court has spoken as to the application of the statutory bar in Perry County v. Railroad Co., 43 Ohio St., 451. The action was brought by the county *133 to recover of the railroad company the cost of constructing a new bridge in lieu of one which has been destroyed by the railroad company in 1871. Full restoration was made by the county in 1878. Concerning the plea of the statute of limitations by the company, Owen, J., on page 455, says: “The plea of the statute of limitations which the demurrer interposed to the petition is untenable. From the time the injuries complained of were committed, and at least to the time the commissioners made full restoration, the duty of defendant to restore the bridge to its former condition of usefulness and safety was a continuing and subsisting obligation, and each day’s failure to make full restoration was a fresh' breach of such obligation; and lapse of time cannot avail to interpose a bar to recovery * * * .” We here call attention, without quoting, to Railway Co. v. Franz, 43 Ohio St., 623.
These two cases, and the authorities therein cited, generously support the conclusion we have reached. The facts in the case at bar show a continuous obligation upon the plaintiff in error, so long as the relation or employment continued, and each day’s failure to remove the sponge was a fresh breach of the contract implied by the law. The removal of the sponge was a part of the operation, and in this respect the surgeon left the operation uncompleted. See Akridge v. Noble, 41 S. E. Rep. (Ga.), 78, where this-is expressly held.
Another trial will afford plaintiff in error another opportunity to introduce all his evidence.
We have not been able to reach a unanimous judgment in this case, but our number is sufficient to affirm what we regard as sound judgment.

Judgment affirmed.

Btjkket, O. J., and Skear, J., concur.